884 A.2d 821 (2005)
381 N.J. Super. 63
RUTGERS COUNCIL OF AAUP CHAPTERS, Petitioner-Respondent,
v.
RUTGERS, The STATE UNIVERSITY, Respondent-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued September 14, 2005.
Decided October 20, 2005.
*823 John J. Peirano, Morristown (McElroy, Deutsch, Mulvaney & Carpenter) and Bruce H. Sales, Westfield (Lerner, David, Littenberg, Krumholz & Mentlik) argued the cause for appellant (Mr. Peirano, of counsel and on the brief; Vimal K. Shah, Morristown, Francis E. Loren and Beckman Rich, on the brief).
Paul Schachter argued the cause for respondent Rutgers Council of AAUP Chapters (Reinhardt & Schachter, attorneys; Mr. Schachter, of counsel and on the brief).
Robert E. Anderson, General Counsel, argued the cause for respondent New Jersey Public Employment Relations Commission (Susan E. Galante, Deputy General Counsel, on the brief).
Before Judges WEFING, WECKER and GRAVES.
The opinion of the court was delivered by
WEFING, P.J.A.D.

I
In April 1996, the Board of Governors of Rutgers, The State University of New Jersey ("Rutgers") approved an amendment to the University's Patent Policy. In April 2003, Rutgers Council of AAUP Chapters ("AAUP") filed a petition with the Public Employment Relations Commission ("PERC") seeking a determination that certain aspects of that Patent Policy were subject to mandatory negotiation and could not be unilaterally adopted by the University. Rutgers appeals from PERC's Final Decision upholding certain portions of AAUP's position. AAUP has not cross-appealed. After reviewing the record in light of the contentions advanced on appeal, we affirm in part and reverse in part.
Rutgers is included among the premier research universities in the nation. Ashley Packard, Copyright or Copy Wrong: An Analysis of University Claims to Faculty Work, 7 Comm. L. & Pol'y 275 n. 98 (2002). As such, research has for many years been a critical aspect of Rutgers fulfilling its responsibilities as New Jersey's state university. Every full-time member of the faculty at Rutgers is expected not only to teach, but also to engage in research and other scholarly activities. Such activities on the part of the faculty have resulted not just in the general advancement of knowledge but in discoveries which have yielded patents and economic benefits. Universities across the nation are attuned to the economic significance of the research activities in which their faculties are engaged. "In 1999 the top 100 research universities earned more than $862 million in royalties from faculty inventions, compared to $725 million in 1998." Packard, supra, 7 Comm. L. & Pol'y at 276.
*824 Congress has also recognized that such research is vital to the continued strength and expansion of our national economy. In 1980, Congress passed the Patent and Trademark Act Amendments, commonly referred to as the Bayh-Dole Act, 35 U.S.C.A. §§ 200 to 212, to provide federal funding for academic research. The statute was "enacted to foster commercial development of government funded research." Platzer v. Sloan-Kettering Inst. for Cancer Research, 787 F.Supp. 360, 365 (S.D.N.Y.), aff'd o.b., 983 F.2d 1086 (1992), cert. denied, 507 U.S. 1006, 113 S.Ct. 1648, 123 L.Ed.2d 270 (1993).
One commentator summed up the statute's approach in the following manner:
[A] government agency sponsors research conducted by faculty, with the university acting as the contractor. If faculty develop an invention arising from the research, they follow disclosure procedures outlined under the law. The university can then elect title to the invention and work with the faculty members to apply for a patent and to market the invention. The government receives a nonexclusive, nontransferable, irrevocable, paid-up license (shop right) to the invention, and the faculty member receives a percentage of the royalties.
[Pat K. Chew, Faculty-Generated Inventions: Who Owns the Golden Egg? 1992 Wis. L.Rev. 259, 293-94 (1992).]
PERC acknowledged in its decision the importance to Rutgers of the research efforts of its faculty, particularly after the passage of the Bayh-Dole Act.
Sixty percent of Rutgers' research is now federally-funded and is subject to the Bayh-Dole Act's provisions concerning, e.g., disclosure of inventions, distribution and use of royalty income, and the university's ability to retain title to inventions or discoveries emanating from federal funding. The Bayh-Dole Act does not pertain to inventions and discoveries resulting from non-federally funded research.
Prior to the passage of Bayh-Dole, universities nationwide received fewer than 250 patents per year, compared to 3100 in 2001. In 2000, Rutgers received $10 million in annual royalty income and had 252 patents under license.
[Rutgers, The State Univ. v. Rutgers Council of AAUP Chapters, 30 NJPER 44 (2004).]
In recognition of the critical role that research holds in the university-wide community, the Board of Governors first adopted a Patent Policy in 1962. The 1996 Patent Policy that is before us on this appeal is the fourth such Policy adopted by the University. The Policy defines its scope and applicability in the following manner:
Rutgers, The State University of New Jersey is dedicated to the principle of service in the public interest, to excellence in education at all levels, and to the advancement of knowledge through research and scholarship. Some knowledge can be reduced to practice as useful inventions that directly benefit the public. It is the University's intent to make these inventions available to the public at the earliest possible time, using means appropriate for a publicly supported institution to recognize and reward its inventors and research sponsors as well as serve its own interests. This policy is designed to promote a spirit of inquiry, encourage creative activity, and enhance the University's educational and research missions to benefit the economy of New Jersey and the public Rutgers serves.
Because research activities are not restricted to full-time faculty members, the Patent Policy extends to:

*825 All University personnel, including but not limited to members of the faculty and staff holding appointments at or employed by the University, persons holding any form of research appointment, visiting professors or visiting scientists with or without salary, undergraduate and graduate students, graduate assistants, teaching assistants, and post-doctoral fellows.
It also includes "[a]ll other persons with inventions that result in whole or in part from use of University facilities or resources."
Perhaps in recognition of the growing complexity of the areas and methodologies of research today, the 1996 Policy is more extensive and detailed than its predecessors. While covering certain of the same issues, the Policy also addresses other issues for the first time, e.g., equity holdings, and provides for the creation of a Patent Policy Advisory Committee. The 1996 Policy also significantly revises the methodology for distribution of income realized as a result of an invention subject to the Policy for which a patent is issued.
PERC concluded that four subjects contained within this 1996 Policy were mandatorily negotiable: that pertaining to the distribution of royalty income to inventors, that pertaining to the timing of disclosure of inventions and discoveries, that pertaining to the ownership of laboratory notebooks and that pertaining to the terms under which inventions and discoveries are assigned to Rutgers. PERC also concluded that other portions of the Policy which AAUP had challenged were not mandatorily negotiable. As we noted at the outset of this opinion, Rutgers has appealed from the PERC determination, while AAUP has not cross-appealed.
Before proceeding to an analysis of the questions presented, we note the standard of review which governs our disposition of this appeal. PERC is vested with "the power and duty, upon request of any public employer or majority representative, to make a determination as to whether a matter in dispute is within the scope of collective negotiations." N.J.S.A. 34:13A-5.4(d). In reviewing the decision of an administrative agency such as PERC, our review is generally restricted to three inquiries:
(1) whether the agency's action violates express or implied legislative policies, that is, did the agency follow the law; (2) whether the record contains substantial evidence to support the findings on which the agency bases its action; and (3) whether, in applying the legislative policy to the facts, the agency erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.
[City of Jersey City v. Jersey City Police Officers Benevolent Ass'n, 154 N.J. 555, 567, 713 A.2d 472 (1998) (quoting In re Musick, 143 N.J. 206, 216, 670 A.2d 11 (1996)).]
"In the absence of constitutional concerns or countervailing expressions of legislative intent, [courts] apply a deferential standard of review to determinations made by PERC." Ibid. (citing In re Hunterdon County Bd. of Chosen Freeholders, 116 N.J. 322, 329, 561 A.2d 597 (1989)).
"Questions concerning whether subjects are mandatorily negotiable should be made on a case-by-case basis." Troy v. Rutgers, 168 N.J. 354, 383, 774 A.2d 476 (2001) (noting that the issue of the number of days an individual holding a calendar year appointment, as opposed to an academic year appointment, must work is a mandatorily-negotiable term of employment and not a matter of managerial prerogative). "When the dominant issue is an educational goal, there is no obligation to *826 negotiate . . . even though [the matter] may affect or impact upon the employees' terms and conditions of employment." Bd. of Educ. of Woodstown-Pilesgrove Reg'l Sch. Dist. v. Woodstown-Pilesgrove Reg'l Educ. Ass'n, 81 N.J. 582, 591, 410 A.2d 1131 (1980). With that framework in hand, we proceed to the particular questions presented.

II

A
The concluding paragraph of Section B of the 1996 Patent Policy states:
Laboratory notebooks and all other documents pertaining to research activities are the property of the University. These records are necessary for the University to document an invention or discovery and to support a related patent application.
Rutgers contends it had the right, as a matter of managerial prerogative, to enunciate this policy and that PERC's conclusion to the contrary is incorrect. It stresses the need to have these original laboratory notebooks to successfully prosecute a patent application. AAUP, on the other hand, contends that PERC correctly recognized the interests of its members in publishing the results obtained through their research activities. AAUP stresses that advancement and promotion within the academic community are dependent upon publication and that its members require access to these notebooks in order to prepare articles that may be accepted for publication in academic journals.
After assessing these respective positions, PERC concluded "the employees' interest in owning research materials unrelated to patent applications so that they can pursue publication outweighs any demonstrated managerial interest in owning that material." We are unable to agree.
The record before us includes the earlier versions of the University's Patent Policy. Both the 1974 and 1986 versions of that Policy stated, "[N]otebooks and all other documents pertaining to research activities resulting in patent applications are the property of the University and will be retained in the files of the University." These earlier Policies stated they were not to "be construed so as to infringe upon the right of all persons connected with the University freely to pursue research and publish the results obtained." The 1996 Policy before us on this appeal restates this limitation upon its construction.
The record before PERC and before us includes the November 21, 2003, supplemental certification of William T. Adams, Director of Rutgers' Office of Corporate Liaison and Technology Transfer. Mr. Adams states in his certification that ownership of the original laboratory notebooks and other supporting documentation is "necessary for [Rutgers] to document and prove an invention or discovery to the government and other sponsors, and to resolve disputes over inventorship." Mr. Adams also notes that these documents, although owned by Rutgers, "remain in the custody of the academic unit and its researchers and inventors, who have continued access to these documents."
Counsel for Rutgers stipulated at oral argument that the University has no objection to individuals who are subject to the Patent Policy keeping their own copies of the information contained in these laboratory notebooks. Its concern is directed to maintaining the integrity of the books for purposes of pursuing patent applications.
AAUP points to nothing concrete to support its argument that the University's assertion of ownership of these tangible, physical items will in any way impede the ability of its members to publish the *827 results of their research. Because the PERC decision rested, at bottom, upon that speculative contention by AAUP, that aspect of PERC's decision is not supported by the record, and we thus deem it arbitrary, capricious and unreasonable.

B
Section B of the University's 1996 Policy includes the following language:
[I]t is the obligation of the inventor to disclose his/her invention or discovery, including improvements and reductions to practice, to the University in accordance with this policy before disclosure is made of research results by publication or through any other medium.
Hence, any person [subject to the Policy] who conceives or makes or reduces to practice an invention or discovery during the course of, or related to his/her University activities shall promptly, before he/she discloses the same to the public and soon enough to permit timely filing of a patent application . . . disclose the invention, discovery, improvement, or reduction to practice to the Director of the Office of Corporate Liaison and Technology Transfer. . . . All persons who are subject to this policy are required to assign their individual rights to inventions . . . to the University. . . .
Section C of the 1996 Policy provides in pertinent part:
If the University elects not to file a patent application . . . this decision will be communicated promptly to the person who made the disclosure. If such person . . . requests that the University permit him/her to file such a patent application or to have assigned to him/her the University's rights, the University may, at its sole discretion and under conditions it deems appropriate, grant such permission and assign . . . to such person . . . some or all of its rights to such information and to inventions deriving therefrom. In exercising its discretion, the University shall take the following items into account: the public interest; the interests of sponsors . . .; the interests of the inventor and the University; and such other considerations as it deems appropriate. In every case, the University will retain a non-exclusive, royalty-free license to practice the invention for internal University purposes.
In its decision, PERC concluded that Rutgers was obligated to negotiate with AAUP both the provision calling for "prompt" disclosure to the University of an invention or discovery as well as the provision calling for the individual to assign to the University his or her rights to that invention or discovery. PERC reached the first conclusion primarily on the basis that Rutgers had not demonstrated that negotiations "over what constitutes a `prompt' disclosure would significantly interfere with its patent program."
We agree with Rutgers that PERC erred when it ordered the parties to engage in negotiations designed to specify more precisely when an individual is required to disclose to the University an invention or discovery. We are persuaded by Rutgers' assertion that the subject does not permit a more precise formulation. If the question whether a topic is mandatorily negotiable can only be answered on a case-by-case basis, Troy v. Rutgers, supra, 168 N.J. at 383, 774 A.2d 476, surely the question whether an individual has made prompt disclosure can also only be answered on a case-by-case basis, considering the entire context in which the question arises. Indeed, when asked at oral argument for an example of how negotiations might produce a revision to this portion of the Policy, counsel for AAUP responded with formulations containing no *828 greater specificity than the term "promptly." We are satisfied that PERC erred in ordering negotiations on the timing of disclosure.

C
PERC also concluded that Rutgers was required to negotiate the terms under which individuals subject to the Policy assign to the University their rights to inventions and discoveries. In its initial brief, Rutgers asserted that PERC had also erred in concluding that the issue whether individuals subject to the Patent Policy had to assign to the University their rights in inventions and discoveries was mandatorily negotiable. In their responding briefs, both AAUP and PERC argued that individuals subject to the Patent Policy were obligated to make such an assignment. That is no longer an issue on appeal.
To the extent, however, that PERC decided that Rutgers must negotiate the terms of such an assignment, we agree with AAUP and PERC. It is clear from the record that the terms of such an assignment have the potential for a significant impact upon the overall financial compensation an individual may receive as a result of his or her efforts at Rutgers. Such issues of compensation, which "intimately and directly affect[] the work and welfare" of the employee, are mandatorily negotiable. City of Jersey City, supra, 154 N.J. at 568, 713 A.2d 472 (quoting In re Local 195, IFPTE, AFL-CIO, 88 N.J. 393, 404, 443 A.2d 187 (1982)). The University cannot act by its own fiat in such a sphere.

D
Rutgers makes one additional argument, that PERC erred when it analyzed discrete sections of the Patent Policy, rather than viewing it as a comprehensive whole. In support of this position, Rutgers relies upon City of Jersey City, in which the Court upheld, over a PERC decision to the contrary, the authority of Jersey City to implement a plan utilizing civilian personnel to staff administrative and non-police positions and transfer to police positions the officers freed thereby. City of Jersey City, supra, 154 N.J. at 558, 713 A.2d 472.
We are satisfied that Jersey City provides no support for Rutgers' position. The Court in that case was considering a wholly distinguishable factual complex. And, in that very case, the Court reiterated its support for the principle that determinations as to managerial prerogative must be made on a case-by-case basis. Id. at 574, 713 A.2d 472. Rutgers may not evade its obligation to conduct negotiations over the terms of assignment by inserting the subject into its Patent Policy. We perceive no error in the approach adopted by PERC in approaching discrete sections of the Patent Policy challenged by the scope of negotiations petition filed by AAUP.
For the reasons stated, the March 26, 2004, decision by PERC is affirmed in part and reversed in part.